**SO ORDERED.**

**SIGNED this 12 day of May, 2008.**



_____
**A. Thomas Small
United States Bankruptcy Judge**

_____

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF NORTH CAROLINA
## RALEIGH DIVISION

| | |
|---|---|
| IN RE: | CASE NO. |
| SUZANNE FIERO | 08-00287-8-ATS |
| DEBTOR | |

### ORDER ALLOWING MOTION TO DISMISS

The matter before the court is the motion filed by Branch Banking and Trust Company ("BB&T") to dismiss, pursuant to 11 U.S.C. § 707(a), the chapter 7 case of Suzanne Fiero. A hearing took place in Raleigh, North Carolina on April 24, 2008.

Suzanne Fiero, whose name is now Suzanne Clayton, filed a petition for relief under chapter 7 of the Bankruptcy Code on January 15, 2008.[1] Mrs. Clayton's schedules show only two creditors, BB&T and RBC Centura, each holding a deed of trust on one of two parcels of real property owned by Mrs. Clayton in Mitchell County, North Carolina. The debtor has no unsecured creditors.

The two lots in Mitchell County were purchased by the debtor from the Village of Penland in 2004 as part of what turned out to be a massive real estate scam.[2] BB&T financed one of the lots

---

[1] The debtor was married on February 14, 2008, and changed her last name from Fiero to Clayton.

[2] The fraudulent scheme involved Penland selling lots to individuals like Mr. and Mrs. Clayton, who financed the purchases through reputable lenders like BB&T and RBC Centura. An

and contends that Mrs. Clayton's actions in purchasing and financing the lot were "akin" to fraud. Mrs. Clayton maintains that she was an innocent victim of the fraud perpetrated by Village of Penland, and furthermore alleges that BB&T was a participant in the fraudulent scheme. It is not necessary for the court to determine whether or not the debtor or BB&T contributed to the fraudulent endeavor in Mitchell County for the court to decide BB&T's motion.

BB&T contends that this chapter 7 case should be dismissed pursuant to 11 U.S.C. § 707(a) because Mrs. Clayton has a substantial earning capacity, a lavish lifestyle with exorbitant and unreasonable expenses, and significant assets. Furthermore, BB&T maintains that prior to and in anticipation of her bankruptcy, Mrs. Clayton manipulated her affairs to maximize her exemptions and to pay all of her debts except the two to BB&T and to RBC arising from the fraudulent land sale transactions. BB&T filed a proof of claim in the total amount of $157,706.10, secured in the amount of $21,900, and RBC Centura filed a proof of claim for a secured debt of $143,972.08.

Mrs. Clayton argues that she and her husband, like many others, were deceived by the Village of Penland, and as a result incurred substantial unanticipated obligations that they cannot repay. She has had a substantial income and still has a high paying job, but is currently on extended unpaid maternity leave after the birth of twins, and she has not decided whether to return to work. She maintains that her living expenses are reasonable and that her pre-bankruptcy transfers are legitimate.

---

affiliate of the seller leased the lots from the purchasers and was to make the purchasers' mortgage payments. Another affiliate of the seller was to buy the lots from the purchasers in two years. The Claytons and the other purchasers were to make no down payments, no mortgage payments, and at the end of two years realize a substantial profit. The transaction appeared to be too good to be true, and it was.

Income

Ms. Clayton has been employed by SAS Institute for ten years. Her gross monthly income is over $9,000, and her net monthly income, according to her Schedule I, is $5,794.68. In addition to her salary, in March 2008, after her petition was filed, she received an $18,000 discretionary bonus. Ms. Clayton went on disability leave on January 2, 2008, before she gave birth to twins on January 25, and is now on an unpaid leave of absence. SAS has advised her that she will have a job if she chooses to return, but she has not decided whether she will return to work. Her husband also works at SAS and his salary exceeds that of the debtor.

Expenses

Mrs. Clayton's monthly expenses, according to her Schedule J, are $8,303.00, including $1,000 for clothing, $1,200 for recreation, $2,150 for housing, $1,400 for food, $700 for transportation, $500 for home maintenance, and an IRA contribution of $500. Some of the household expenses are paid by the debtor's husband and some of his expenses are included in the expenses claimed by the debtor.

Assets - Real Property

The debtor's only real estate, according to her Schedule A, are the two Mitchell County lots. The lot securing BB&T's claim of $157,706 has a value of $21,900, and the lot securing the $143,972 claim of RBC Centura has a value of $17,500. It is the debtor's intention, according to her Statement of Intention, to surrender the lots to BB&T and RBC Centura. The home where she resides with her husband and infant twins is owned by her non-debtor husband.

Assets - Personal Property

Mrs. Clayton's personal property, according to her Schedule B, includes a Money Market Account with Coastal Federal Credit Union of $12,000, a 401K Fidelity plan worth $209,000, two Schwab IRA accounts worth an aggregate of $56,800, an investment in Full Moon Investments, LLC worth $1,000, and a 2004 Volkswagen automobile worth $15,000. The debtor claimed an exemption for the $12,000 Money Market Account as earnings necessary to support the family pursuant to North Carolina General Statutes § 1-362, and claimed an exemption pursuant to North Carolina General Statutes § 1C-1601(a)(9) for the $209,000 balance of her 401K Fidelity plan and the $56,800 balance of her Schwab IRA accounts. The $1,000 Full Moon Investment was claimed as exempt under the debtor's "wildcard" exemption pursuant to North Carolina General Statutes § 1C-1601(a)(2), as was $3,900 of the value of the her Volkswagen automobile. An additional exemption of $3,500 was claimed for the Volkswagen pursuant to the automobile exemption under North Carolina General Statutes § 1C-1601(a)(3). The debtor claims that the 2004 Volkswagen, valued at $15,000 and for which she claimed exemptions totaling $6,900, is a "lemon."

Pre-bankruptcy transfers

Prior to filing her bankruptcy petition, Mrs. Clayton used an account with Charles Schwab to pay three credit card debts totaling $14,215.31 and to invest $5,000 in one of her IRA accounts. The Charles Schwab account could not have been claimed as exempt by the debtor in her bankruptcy case, and the effect of the transfers was to deplete the account. At the time of these pre-bankruptcy transfers, funds were available in the debtor's Money Market Account, which the debtor has claimed as exempt, that could have been used to satisfy the credit card debts.

Dismissal Under § 707(a)

Section 707(a) of the Bankruptcy Code provides that the court may dismiss a chapter 7 case "after notice and a hearing only for cause . . . ."  11 U.S.C. § 707(a).  Cause for dismissal under § 707(a) has been held to include a lack of good faith in filing the petition.  McDow v. Smith (In re Smith), 295 B.R. 69 (E.D. Va. 2003); In re Zick, 931 F.2d 1124, 1126-27 (6th Cir. 1991).  In ascertaining the debtor's lack of good faith the court should apply a totality of the facts and circumstances test.  Perlin v. Hitachi Capital America Corp. (In re Perlin), 497 F.3d 364 (3rd Cir. 2007); Smith.  Some of the factors include:

> 1. The debtor reduces creditors to a single creditor in the months prior to the filing of the petition;
> 2. The debtor failed to make lifestyle adjustments or continued living an expansive or lavish lifestyle;
> 3. Debtor filed the case in response to a Judgment pending litigation . . . ;
> 4. The debtor made no efforts to repay his debts;
> 5. The unfairness of the use of Chapter 7;
> 6. The debtor has sufficient resources to pay his debts;
> 7. The debtor is paying debts to insiders;
> 8. The schedules inflate expenses to disguise financial well-being;
> 9. The debtor transferred assets;
> 10. The debtor's overly utilizing the protections of the Code to the unconscionable detriment of creditors;
> 11. The debtor employed a deliberate and persistent plan of evading a single major creditor;
> 12. The debtor failed to make candid and full disclosure;
> 13. The debts are modest in relation to assets and income; and
> 14. There are multiple bankruptcies or other procedural "gymnastics."

In re O'Brien, 328 B.R. 669, 675 (Bankr. W.D.N.Y. 2005) (quoting In re Keobapha, 279 B.R. 49, 52 (Bankr. D. Conn. 2002)).

The court may consider the debtor's ability to repay debts, but ability to repay debts alone is not sufficient grounds to dismiss a case under § 707(a).[3] See Perlin; Smith. Mrs. Clayton has the ability to pay her debts, and if ability to pay were the only factor, the court would find that the petition was not filed in good faith and would dismiss her case. Mrs. Clayton testified that she has not decided whether she will return to work, but she remains a SAS employee and her high salaried position is still available to her. Furthermore, her husband, who owns the house where they reside and who contributes to the household expenses, is also employed at SAS and earns a salary in excess of that of the debtor. The debtor has the ability to earn over $100,000 per year and the magnitude of her expenses ($1,000 a month for clothes, $1,200 for recreation, $2,150 for housing, $1,400 for food, $700 for transportation, $500 for home maintenance and $500 for an IRA contribution) suggest a lifestyle that could be scaled back to permit debt repayment.

BB&T argues that there are other factors in addition to Mrs. Clayton's ability to repay that support a finding of lack of good faith and constitute cause to dismiss the case. Specifically, BB&T contends that Mrs. Clayton manipulated her affairs to satisfy all of her creditors with the exception of BB&T and RBC Centura, and that her pre-bankruptcy transfers were designed to convert non-exempt assets to exempt assets and to protect them from her two remaining creditors. According to BB&T, by cashing out her non-exempt Schwab Investment Account to pay credit card debts and to fund an IRA, the debtor was protecting her exemptible Money Market Account and padding her exemptible IRA.

---

[3] A totality of the circumstances test also applies with respect to dismissal for abuse under § 707(b), in which a debtor's ability to repay may be considered as a factor, but standing alone is not grounds for dismissal. Green v. Staples (In re Green), 934 F.2d 568 (4th Cir. 1991). Section 707(b) applies to debtors whose debts are primarily consumer debts, and because Mrs. Clayton's debts are not primarily consumer debts, § 707(b) is not applicable in this case.

6

The debtor maintains that she has done nothing improper. She was about to give birth to twins and she knew that she would be out of work for some period of time. She always paid her credit card balances and made the decision to pay them from her Schwab Investment account rather than from her Money Market Account. According to Mrs. Clayton, there is nothing wrong with paying some of her creditors prior to filing, and, if the payments are preferential transfers, her chapter 7 trustee has the authority to avoid them. She also maintains that she is not eligible for chapter 13 relief because she has no regular income, and that if she and her husband were to file a joint chapter 13 petition, they would exceed the chapter 13 debt limits.[4]

The court agrees with BB&T that cause exists under § 707(a) to dismiss this case. The debtor has the ability to pay her debts, both from her income and from her exempt assets. Additionally, she has manipulated her financial circumstances so that all of her debts have been satisfied, except those owing to BB&T and to RBC Centura. She also arranged her accounts so that she has few nonexempt assets and exempt assets in excess of $278,000. She may or may not, as she contends, qualify for chapter 13 relief, but even if she is not eligible to be a chapter 13 debtor, there are other ways to deal with her obligations to BB&T and to RBC Centura. She could file for relief under chapter 11, she could negotiate a settlement with BB&T in which she reaffirms all or part of the debt, or she could reach an agreement with the creditors outside of bankruptcy. She also may elect to litigate her allegation that BB&T participated in the fraudulent scheme by challenging BB&T's foreclosure, defending against any deficiency claim brought by BB&T after the foreclosure, or by bringing suit against BB&T. Mr. Clayton is one of many plaintiffs in a lawsuit

---

[4]The debtor submitted two illustrative "means tests" to show that her case is not an abuse of chapter 7, but the "means test" has no application to a motion to dismiss under § 707(a).

7

against the sellers and others, including BB&T and RBC Centura, and Mrs. Clayton may want to join in that litigation.

In any event, discharging Mrs. Clayton's obligation to BB&T in this chapter 7 case is not an appropriate course of action, and, for the reasons previously stated, the court finds that her bankruptcy petition was not filed in good faith and concludes that this case should be dismissed pursuant to § 707(a).

Accordingly, the motion to dismiss is **ALLOWED**, and this chapter 7 case is **DISMISSED.**

**SO ORDERED**.

**END OF DOCUMENT**